UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

DAWN MOXLEY,                          )
                                      )
            Plaintiff,                )
                                      )
      v.                              )          Case No. 1:17-cv-691
                                      )
STATE OF NEW YORK, OFFICE OF          )
MENTAL HEALTH (BUFFALO                )
PSYCHIATRIC CENTER), and DR. ANN      )
MARIE T. SULLIVAN, COMMISSIONER       )
OF THE OFFICE OF MENTAL HEALTH,       )
in her official capacity,             )
                                      )
            Defendants.               )

**ORDER ON MOTION FOR SUMMARY JUDGMENT**
**(Doc. 14)**

Plaintiff Dawn Moxley has filed this employment discrimination and retaliation suit

against her former employer, the New York State Office of Mental Health ("OMH") and OMH's

Commissioner Dr. Ann Marie T. Sullivan (collectively, "Defendants"). In her verified

complaint, Ms. Moxley claims that she was subjected to discrimination "based on gender and

disability, to harassment and a hostile work environment, and denied a reasonable

accommodation for her disability beginning in April of 2016 in connection with an incident that

happened between Plaintiff and her Supervisor, Mr. McCray." (Doc. 1 ¶ 9.)

The verified complaint asserts four causes of action. (*See id.* ¶¶ 47–62.) First,

Ms. Moxley alleges disability discrimination and retaliation in violation of the Americans with

Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). Second, she alleges disability and gender

discrimination in violation of the New York Human Rights Law, N.Y. Exec. Law § 296 *et seq.*

("NYHRL"). Third, she alleges gender discrimination in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Finally, she alleges disability

discrimination in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* ("Rehab

Act"). For relief, Ms. Moxley seeks a declaration that Defendants' acts are unlawful, a

permanent injunction ordering Defendants to cease and desist from such allegedly unlawful acts,

an award of lost wages and compensatory damages, and costs incurred together with interest and

attorney's fees. (*See* Doc. 1 *ad damnum* b–f.)

Defendants have filed a motion for summary judgment arguing that there is no merit to

Plaintiff's claims. (Doc. 14.)[1] Plaintiff opposes the motion on the grounds that genuine issues of

material fact exist as to all of Defendants' arguments. (Doc. 18.) Defendants filed their reply on

July 24, 2019. (Doc. 25.)[2]

---

[1] Defendants have not raised Eleventh Amendment sovereign immunity as a defense in their Answer (Doc. 5), nor do they raise it as an issue in their motion for summary judgment (Doc. 16). The court notes the holding in *Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356 (2001), that the Eleventh Amendment bars suits in federal court by state employees to recover money damages for failure to comply with Title I of the ADA. Relying on *Garrett*, other courts have found Title I ADA claims brought by state agency employees to be barred. *See Darcy v. Lippman*, 356 F. App'x 434, 436 (2d Cir. 2009) (summary order) (former state employee's claims seeking damages from New York State and the state's court system were barred by the Eleventh Amendment); *McClain v. N.Y. State Dep't of Taxation & Fin.*, No. 13-CV-3104 (NGG)(RML), 2014 WL 4101517, at *4 (E.D.N.Y. Aug. 18, 2014) (state department of taxation employee's Title I ADA claim for alleged failure to grant a reasonable accommodation for her back injury was barred by the Eleventh Amendment). But Ms. Moxley is also claiming a violation of the Rehab Act, and that claim is probably not barred. *See Marino v. City Univ. of N.Y.*, 18 F. Supp. 3d 320, 331 (E.D.N.Y. 2014) ("New York's continued acceptance of federal funds under § 504 . . . constitutes a knowing waiver of sovereign immunity under that provision."). The court has followed Defendants' lead in reaching the merits on all four counts in Plaintiff's complaint.

[2] Plaintiff suggested in her opposition (Doc. 18 at 1 n.1) that no reply should be permitted under Local Rule 7(a)(1) because Defendants failed to state in their moving papers that they intend to file and serve a reply. However, Plaintiff later interposed no objection to Defendants' request for an extension of time to file a reply (*see* Doc. 22), and the court granted the requested extension (Doc. 23). Plaintiff has not moved to strike the reply, and even if she had the court would not grant that relief in this case. *See Kroemer v. Tantillo*, No. 1:17-cv-67, 2017 WL 6409148, at *1 n.2 (W.D.N.Y. Sept. 21, 2017) (proper remedy for failure to comply with Local

The court has compiled the following factual background with reference to the verified complaint,[3] the parties' Rule 56 statements, the evidence submitted, and materials that may properly be noticed. The facts are undisputed except where noted.

## I. OMH Hires Ms. Moxley in 2002

Defendant OMH hired Ms. Moxley in 2002 and she began working that year as a cleaner at OMH's Buffalo Psychiatric Center ("BPC"). The BPC campus includes the Strozzi building (an inpatient hospital), the two-floor outpatient Butler Rehabilitation building, and the outpatient RCCA building (a residential treatment facility). (*See* Doc. 15-1 at 31–32; 15-3 at 10–11, 22, 35; *see also* Doc. 15-14.) Ms. Moxley worked primarily in the Butler building. (*See* Doc. 19-17 ¶ 5.) The BPC campus is contiguous with SUNY Buffalo State College. (*See* Doc. 19-3.)

Cleaners are part of the Environmental Services Department at BPC. The hierarchy in the Environmental Services Department during the relevant time period was, from top down, chief housekeeper, supervising housekeeper, housekeeper, and cleaner. Robert Jones was a supervising housekeeper at BPC during the relevant time period. The chief housekeeper reported to BPC's Deputy Director of Facility Administration and Support Services, Brenda DiMillo, who supervised several support departments including the Environmental Services Department.

In addition to supervising the Environmental Services Department, Ms. DiMillo also supervised BPC's safety department. (Doc. 19-14 at 2.) Ms. DiMillo testified that there is a security guard posted at the Butler building and that the safety department patrols the BPC

---

Rule 7(a)(1) was to caution party to comply with the requirements of the Local Rules). The court has accordingly considered Defendants' reply.

[3] *See Bennett v. Goord*, 343 F.3d 133, 139 (2d Cir. 2003) (verified complaint is treated as an affidavit for summary judgment purposes).

campus including the Butler building, but that the safety department does not have a post at the Butler building. (*Id.* at 2–3.)

## II.    Ms. Moxley and Mr. McCray's Relationship

In approximately 2005, Ms. Moxley entered into a romantic relationship with Timothy McCray, who was also a BPC employee. Ms. Moxley and Mr. McCray lived together from 2013 to 2015. The romantic relationship lasted approximately ten years and ended in approximately August 2015. After the relationship ended, Ms. Moxley and Mr. McCray continued to see each other at work and Mr. McCray stayed at Ms. Moxley's house until October 2015. Mr. McCray assisted Ms. Moxley when she was hospitalized and had surgery in December 2015. They celebrated Christmas together in December 2015. Ms. Moxley lent Mr. McCray money in January 2016 so he could go to Texas, and he went to see her upon his return. Mr. McCray took Ms. Moxley to the hospital again in March 2016. He took Ms. Moxley's children to the movies on April 2, 2016.

## III.    The April 5, 2016 Incident

In the late hours of April 4 or early hours of April 5, 2016, an incident occurred between Ms. Moxley and Mr. McCray at her home (the "April 5 incident"). Ms. Moxley alleges that Mr. McCray came over unannounced and tried to rape her. (Doc. 1 ¶ 11.) After the incident, Ms. Moxley called the police and Mr. McCray was arrested and charged with violating N.Y. Penal Law 130.52 and N.Y. Penal Law 240.26. (*See* Doc. 15-6.)

Ms. DiMillo testified that she first learned of an incident between Ms. Moxley and Mr. McCray the day after the incident. (Doc. 15-3 at 13.) When Mr. McCray came to work on April 5, 2016, OMH put him on administrative leave. While on administrative leave, Mr. McCray was required to call in to Ms. DiMillo daily.

## IV.    Ms. Moxley Returns to Work

There are discrepancies in the record as to which days after the April 5 incident Ms. Moxley worked at BPC. Her time and attendance records reflect that she worked at BPC every day during the week of April 4–8, 2016. (Doc. 15-10 at 1.) At her deposition, Ms. Moxley initially testified that she did not work at BPC on April 5, 2016 but that she worked at another employer, Amherst Security Professionals, in the evening on that date, and that she worked her usual shift at BPC on April 6, 2016. (Doc. 15-1 at 8–9.) Later in her deposition she testified that she worked at BPC and at her second job on April 5, 2016, and that she did not work at BPC on April 6, 2016. (*Id.* at 22.)

Ms. Moxley's time and attendance records indicate that she worked at BPC on April 7 and 8, 2016. (Doc. 15-10 at 1.) She testified at her deposition that she did not work on April 7 or April 8, 2016. (Doc. 15-1 at 23–24.) The time and attendance records reflect that Ms. Moxley worked at BPC on April 11–15, 2016. (Doc. 15-10 at 1.) She testified that she did not recall whether she worked on April 11 or 15, 2016, but that she worked on April 12–14, 2016. (Doc. 15-1 at 24–25.)

The time and attendance records reflect that Ms. Moxley went out on FMLA leave on April 18, 2016 and returned to work on May 9, 2016. (Doc. 15-10 at 1, 3.) Ms. Moxley testified that she was not sure when she went out on FMLA leave, but that she thought it was later than April 18, 2016. (Doc. 15-1 at 25.) She testified that her memory was not refreshed by a letter from Karen Zappia stating that her absence beginning April 18, 2016 due to an illness was designated as family medical leave. (*Id.* at 25–26.) She testified that she does not recall the dates when she was out on FMLA leave, and she does not recall whether May 9, 2016 was the date she returned to work after being on FMLA leave. (*Id.* at 26–27.)

The time and attendance records reflect that Ms. Moxley worked four more days at BPC, May 9–12, 2016. (Doc. 15-10 at 3.) Of those days, Ms. Moxley could only recall working on May 12, 2016. (Doc. 15-1 at 27–30.) The time and attendance records indicate that Ms. Moxley had a vacation day on May 13, 2016 and that all of her remaining workdays through May 25, 2016 were FMLA leave or FMLA lieu sick leave. (Doc. 15-10 at 3.) Ms. Moxley testified that those notations are consistent with her recollection and that the last day she came in to work at BPC was May 12, 2016. (Doc. 15-1 at 29–30.)

Despite the above discrepancies, it is undisputed that after the April 5 incident, Ms. Moxley worked at BPC 13 days at most and that Mr. McCray was not permitted on BPC property during that time. Additional facts regarding the events in the days after the April 5 incident are set forth below.

## V.    Mr. McCray's April 8, 2016 Arraignment; Entry of Temporary Order of Protection

It is undisputed that Mr. McCray was arraigned at the Buffalo City Court on April 8, 2016. Ms. Moxley was present at the arraignment. She testified that she saw Mr. McCray and his nephews Carl Brown and Monroe Williams inside the courthouse. (Doc. 15-1 at 21.) Mr. Brown and Mr. Williams were also cleaners at BPC. (*Id.*) According to Ms. Moxley, "[t]he way they looked at me and my daughter, if looks could kill, we would be dead. It was very uncomfortable." (*Id.*) It is undisputed that neither Mr. Brown nor Mr. Williams spoke to Ms. Moxley at that time.

In connection with the court proceedings, the Buffalo City Court entered a Temporary Order of Protection ("TOP") against Mr. McCray. (Doc. 15-11.) Ms. Moxley was provided a copy of the TOP. The TOP directed Mr. McCray to, among other things, stay away from and refrain from communication with Ms. Moxley and her daughter, and to stay away from Ms.

Moxley and her daughter's home, school, business, and "place of employment." (*Id.*) The TOP specifically required Mr. McCray to stay 100 feet away from Ms. Moxley. (*Id.*)

## VI. Ms. Moxley's Mid-April 2016 Communications with BPC Leaders

On April 12, 2016, Ms. Moxley met with Ms. DiMillo and BPC's Executive Director Dr. Celia Spacone to discuss the incident with Mr. McCray and the TOP. Ms. DiMillo has testified that she and Dr. Spacone advised Ms. Moxley at that meeting that Mr. McCray was on leave. (Doc. 15-3 at 17.) Ms. Moxley testified that she has no recollection of whether Mr. McCray was suspended from his employment at BPC because of the April 5 incident. (Doc. 15-1 at 14.) During the meeting, Plaintiff provided Ms. DiMillo and Dr. Spacone with a copy of the TOP and the three discussed what would happen if Mr. McCray returned to work. Ms. DiMillo suggested that Mr. McCray could work in the Strozzi building because it was more than a hundred yards from the Butler building. (Doc. 15-3 at 19.)

On April 13, 2016, Ms. Moxley sent Dr. Spacone and Ms. DiMillo an email following up on the April 12 meeting and stating that upon reflecting on that conversation she "could not help but feel concerned for my safety." (Doc. 15-12 at 4.) She stated that her understanding from the April 12 meeting was that Mr. McCray would be restricted from entering the Butler building. She supplied details about what she alleged occurred during the April 5 incident because she felt that it was "imperative" that Dr. Spacone and Ms. DiMillo understand "the severity of the present situation." (*Id.*) She noted that Mr. McCray's nephews Mr. Brown and Mr. Williams appeared at the April 8, 2016 arraignment. She noted that Mr. Brown and Mr. Williams were also cleaners at BPC and that they worked in the RCCA building, which she described as less than 100 feet from the Butler building. She asked: "[H]as that been considered? Has the parking

lot been considered?" (*Id.*) She concluded: "I hope that this helps you to understand why I am so uncomfortable and fearful." (*Id.*)

Ms. DiMillo responded to Ms. Moxley's April 13 email the same day. She wrote: "Dawn, I understand your concerns. Tim McCray is currently not permitted on the grounds of Buffalo PC. If Tim or anyone else tries to intimidate you, please notify me immediately. If there [are] any additional concerns, please let me know." (Doc. 15-12 at 3.) Dr. Spacone responded later on April 13, writing: "I have been in Albany. Thanks for following up, Brenda. I am sorry, Dawn, for what occurred. Would you like to obtain a counseling referral from EAP? I hope you feel safe at work. Keep us posted." (*Id.*)[4] On April 14, 2016, Ms. DiMillo emailed Ms. Moxley and stated:

> Dawn, Just wanted to include that if anyone, related to Tim McCray or not, tries to intimidate you, please report it immediately. If you feel unsafe going to or coming from your car, please try to walk in with and out with a co-worker as a normal routine. If you still feel[] a situation is unsafe, she should contact safety for an escort or any support needed.

(Doc. 15-12 at 2.) Ms. DiMillo testified that after receiving Ms. Moxley's April 13 email, she told Mr. Brown and Mr. Williams to avoid Ms. Moxley. (Doc. 15-3 at 27.)

## VII.    Alleged Harassment at BPC

Ms. Moxley alleges that she was harassed at BPC between the date that she returned to work after the April 5, 2016 incident and the last day that she worked on May 12, 2016.

### A.    Alleged Harassment by Mr. McCray's Nephews

In her verified complaint, Ms. Moxley alleges that Mr. McCray's nephews Mr. Brown and Mr. Williams "harassed and intimidated" her after the April 5 incident. (Doc. 1 ¶ 30.) According to Ms. Moxley's testimony, the harassment consisted of "very threatening looks" that

---

[4] The EAP is the Employee Assistance Program. (*See* Doc. 19-13 at 3.)

made her feel "uncomfortable and fearful." (Doc. 15-1 at 50.) Ms. Moxley could not recall the dates or number of instances of threatening looks. (*Id.*) She testified that Mr. Brown and Mr. Williams would give her threatening looks "[w]henever they would walk and see me in the parking lot, walk by my building, through my building." (*Id.* at 48.)

Ms. Moxley testified that she verbally complained about the harassment to the EAP coordinator, Anne. (Doc. 19-13 at 3.) She could not recall the date that she made the complaint. (*Id.*) She did not complain to Ms. DiMillo or Dr. Spacone. (*Id.*) According to Ms. Moxley, Anne told her to call Celestine Simmons, the affirmative action officer, and ask for a reasonable accommodation. (*Id.*)

## B. Alleged Harassment by Ms. Moxley's Supervisor, Robert Jones

In her verified complaint, Ms. Moxley also alleges that supervising housekeeper Robert Jones is "good friends" with Mr. McCray and that upon her return to work after the April 5 incident Mr. Jones "immediately" began harassing her "for pressing charges and for obtaining an Order of Protection against Mr. McCray." (Doc. 1 ¶ 25.) Supervising housekeeper Antione Fingers states that he spoke with Mr. Jones at work after the April 5 incident and that Mr. Jones was "very upset" and stated, "How could someone do something like that?" (Doc. 19-17 ¶ 11.) Mr. Fingers stated that Mr. Jones was referring to Ms. Moxley's accusations of sexual assault against Mr. McCray. (*Id.*)

Mr. Jones's alleged harassment took several different forms.

### 1. Alleged Increased Workload

Ms. Moxley alleges in her verified complaint that, on or about April 11, 2016, Mr. Jones informed her that he reassigned Greg Wright—a cleaner assigned to clean the upper portion of the Butler building—leaving Plaintiff with additional work. (Doc. 1 ¶ 26.) According to

Ms. Moxley, she asked Mr. Jones how she was supposed to keep the building up to standards and he told her that it was up to her to clean the entire building herself and that she would have to "figure it out." (*Id.* ¶ 27.)

Ms. Moxley's testimony is that Mr. Wright stopped cleaning the Butler building on April 6, 2016 and that Mr. Jones told her that he had reassigned Mr. Wright on April 11, 2016. (Doc. 15-1 at 32–33.) According to Ms. Moxley, another cleaner, Eugene Boquard, came to the Butler building but only "for a limited time on certain days." (*Id.* at 34.) Ms. Moxley could not recall how many days she had to clean the Butler building without Mr. Wright's assistance. (*Id.* at 35.) But she testified that after Mr. Jones reassigned Mr. Wright, Mr. Brown did not help to clean the Butler building and Mr. Boquard came to the Butler building "when Mr. Jones felt like sending him." (*Id.* at 39.)

BPC records in the form of Daily Assignment Sheets reflect that Mr. Wright's assignment remained unchanged during April 2016. (Doc. 15-15.) He was listed as assigned to "outpatient." (*Id.*) BPC records also reflect that Mr. Wright took personal days on April 11 and 18, 2016 (Doc. 15-16) and that Ms. Moxley took sick leave on April 18, 2016 (Doc. 15-10 at 1).

Mr. Jones testified that before Mr. McCray was placed on administrative leave, Ms. Moxley and Mr. McCray cleaned the Butler building, and Mr. Wright and Mr. McCray's nephew Mr. Brown helped. (Doc. 15-4 at 7–8.) He also testified that Mr. Boquard helped to clean the Butler building after Mr. McCray left. (*Id.* at 8.) He repeatedly testified that before Mr. McCray was placed on administrative leave, he (McCray) controlled everything in terms of cleaning assignments for the outpatient portion of BPC (i.e., the Butler and RCCA buildings). (*See, e.g., id.* at 4–5.) He further testified that for the period that Mr. McCray was out, the

cleaning staff was shorthanded because there were no new hires, and that there were no daily assignments because the remaining cleaners "went to temporary places." (*Id.* at 10.)

## 2. Alleged Refusal to Address Issues

Ms. Moxley alleges in her verified complaint that Mr. Jones "also began refusing to address issues in the building that directly affected Plaintiff's work environment." (Doc. 1 ¶ 28.) She alleges that "[h]e ignored Plaintiff's pages and calls making it impossible to communicate with him." (*Id.*) Regarding the latter allegation, Ms. Moxley testified that she did not have an estimate as to how many times she paged or called Mr. Jones. (Doc. 15-1 at 39–40.)

Ms. Moxley testified that this alleged refusal to address issues included the situation with Mr. Wright being reassigned, but also included other acts by Mr. Jones. (*Id.* at 36–37.) According to Ms. Moxley's testimony, one such act was Mr. Jones's reaction to her request that he address a situation where BPC staff had poured ground cinnamon on the floor. (*Id.* at 37.) She testified that the spilled cinnamon required that the floor be stripped and waxed—a job that cannot be done by a single cleaner. (*Id.*) According to Ms. Moxley, she asked Mr. Jones to look at the floor and she asked what to do about it, but Mr. Jones refused to come look at the floor or address the situation with BPC staff, stating, "it's on you, Mox, deal with it." (*Id.*)

Mr. Jones testified that he recalled Ms. Moxley's complaint about the cinnamon to be that "[s]omebody just threw it on the floor." (Doc. 15-4 at 16.) When asked whether the floor would have to be stripped to clean up ground cinnamon, Mr. Jones testified: "Not necessarily." (*Id.* at 15–16.) He testified that he would use a "[f]loor machine" to clean up ground cinnamon. (*Id.* at 15.) He testified that there was a floor machine in the Butler building and that Butler "was her [Ms. Moxley's] building." (*Id.*)

### 3. Alleged Statement that Ms. Moxley Failed to Report on May 12, 2016

The third way that Ms. Moxley claims that Mr. Jones harassed her arises out of an incident that occurred on May 12, 2016—Plaintiff's last day actually working at BPC. She alleges that Mr. Jones told Ms. DiMillo that she (Ms. Moxley) never reported to work that day. (Doc. 1 ¶ 29.) According to Ms. Moxley's verified complaint, she was at work "all along" on that date. (*Id.*) Her testimony is that she worked seven hours on May 12, 2016. (Doc. 15-1 at 27.)

It is undisputed that, on May 12, 2016, Mr. Jones told Ms. DiMillo that Ms. Moxley left BPC during her morning break and had not returned, that he tried to call Mr. McCray, and that he was concerned that Mr. McCray and Ms. Moxley might be together. Ms. Moxley's break ended at 10:15 a.m. (Doc. 15-4 at 17.) Mr. Jones testified that he was looking for Ms. Moxley at 10:20 a.m. because he saw her leave and return in her car during her break the previous day. (*Id.* at 18.) According to Mr. Jones, he looked outside shortly after 10:15 a.m. and saw that her car was not there. (*Id.* at 19.)

He testified that he then called Ms. DiMillo and the two of them went to the Butler building and went through the "whole building." (*Id.* at 19–21.) He further testified that he did not go inside the auditorium, pool, or locker rooms—areas that cleaners are responsible for cleaning (*see id.* at 6–7)—but that he and Ms. DiMillo "went through all the areas she should have been at and she was not there." (*Id.* at 21.) Mr. Jones stated that, while he was walking around the Butler building, he did not ask anyone there whether they had seen Ms. Moxley. (*Id.*) He further testified that Ms. Moxley's cell phone number was posted in the Strozzi building, but he did not try calling that number. (*Id.* at 22.)

Ms. DiMillo's testimony is that Mr. Jones called her at "maybe eleven o'clock in the morning" and that she and Mr. Jones went to the Butler building at about 1:00 p.m. (Doc. 15-3 at 30.) She testified that they saw Mr. Boquard and asked if he had seen Ms. Moxley, and he replied that he had not. (*Id.*) According to Ms. DiMillo, they asked the security guard, Mickey, if he had seen Ms. Moxley, and he said no. (*Id.* at 31.) She testified that the locker rooms are used when the pool is in use but that the pool is not used every day. (*Id.*) She and Mr. Jones walked the corridors of the Butler building. (*Id.* at 33.) According to Ms. DiMillo, they "assumed that Dawn wasn't there." (*Id.* at 31.)

A typewritten note that Ms. DiMillo wrote regarding the events of May 12, 2016 indicates that she and Mr. Jones did not see Ms. Moxley in the break area or the halls and did not see her car in the parking lots. (Doc. 15-17 at 1.) Included with Ms. DiMillo's typewritten note are handwritten statements from several of Ms. Moxley's coworkers, including Mr. Jones, "Micky," Mr. Wright, and Mr. Boquard. (*Id.* at 2–8.) Also according to Ms. DiMillo's written note, Mr. McCray called her on May 13, 2016 and stated that Ms. Moxley "had driven by his house on 5/12/16 and that he talked to her." (*Id.* at 1.)

BPC investigators interviewed Mr. McCray's nephews Mr. Brown and Mr. Williams as part of Mr. McCray's appeal of his disciplinary sanction.[5] Mr. Williams described a day in May—he could not remember the precise date—when he saw Ms. Moxley and Mr. McCray sitting in a car together near Mr. McCray's home. (Doc. 15-19 at 3–4.) He testified that he left work that day and was in the area because he was looking for Mr. McCray after receiving phone calls from relatives who could not find Mr. McCray. (*Id.* at 5–6.) Similarly, Mr. Brown testified that on one day after the April 5 incident he received phone calls from relatives who were unable

---

[5] The discipline against Mr. McCray and his appeal to an arbitrator are discussed below.

to contact Mr. McCray and that he and Mr. Williams left work to find Mr. McCray. (Doc. 15-18 at 5.) He testified that they spotted him in a car with Ms. Moxley. (*Id.* at 6.) Mr. McCray testified at his arbitration that Ms. Moxley came to his residence on May 12, 2016, and the two talked for two hours. (Doc. 15-9 at 15.)

Ms. Moxley testified that, while she was at work on May 12, 2016, she called Mr. McCray at his mother's house. (Doc. 15-1 at 42.) A transcript of that telephone call appears at Document 17-1.[6] Ms. Moxley admitted at her deposition that she left work on May 12, 2016 and went and saw Mr. McCray on Eagle Street by his mother's house, but she stated that it was for the sole purpose of retrieving a cellular phone. (*See* Doc. 15-1 at 45.) She testified that she asked Mr. McCray to give her the cell phone and that he did so "[a]nd that was it." (*Id.* at 48.) She testified that she did not get in a car with him, did not stay and talk about the April 5 incident or anything else, and that while she could not recall how long she met with Mr. McCray, she did not think it was very long. (*Id.* at 47–48.) She denied her coworkers' statements to the effect that she left work that day around 10:00 a.m. and did not return until around 2:00 p.m. (*Id.* at 46.)

### 4. Alleged Denial of Leave Request

In her verified complaint, Ms. Moxley states that she has been suffering from a disability as a result of the sexual assault. (Doc. 1 ¶ 15.) She claims that as a result of the harassment and the fact that she did not feel safe from Mr. McCray, her disability worsened and she began having increased panic attacks at work. (*Id.* ¶ 31.) She states that she asked to use her vacation time to get better but was told that her request could not be approved due to a shortage in staff.

---

[6] Ms. Moxley and Mr. McCray discussed the April 5 incident during another phone call. An undated transcript of that call appears at Document 17-2.

(*Id.* ¶ 32.) Ms. Moxley's testimony is that on May 12, 2016 she asked to use vacation time on May 13, 2016 and that—despite a notation on her time and attendance record that she used eight hours of vacation time on May 13—Ms. DiMillo denied her request to use vacation time for that date. (*See* Doc. 15-1 at 28–29.) It is undisputed the last day Ms. Moxley came in to work at BPC was May 12, 2016; she did not report to work at BPC on May 13, 2016.

Regarding the explanation she received for the denial of her leave request, Ms. Moxley suggests that the staff shortage was not unusual. She points to Mr. Jones's testimony that BPC has been short-staffed on cleaners since 2000. (Doc. 19-15 at 2.) She also refers to the affidavit of John Shedler, a BPC plumber, who stated that "BPC has been short-staffed on housekeepers and cleaners on many occasions." (Doc. 19-16 ¶ 16.) Mr. Shedler further stated that "[t]he staff shortage in the spring of 2016 was nothing different than what the Environmental Services unit typically experienced in the years before." (*Id.*) In addition, according to OMH leave request documents, other male BPC cleaners were granted vacation and medical leave at various times between April and August 2016. (*See* Docs. 19-6, 19-7, 19-8, 19-9, 19-10, 19-11, 19-12.)

Ms. Moxley states that her physician took her out of work on or about May 12, 2016. (Doc. 1 ¶ 33.) She further states that on or about May 19, 2016, she was notified that she exhausted all of her paid time off and that she would be placed on sick leave without pay effective June 13, 2016. (*Id.* ¶ 34.) According to the verified complaint, she submitted a request for sick leave at half pay, which was granted. (*Id.*)

## VIII. Requests for Accommodation and OMH's Response

### A. May and August 2016 Requests

Ms. Moxley requested an accommodation in an August 5, 2016 email addressed to Dr. Spacone, Mr. Jones, Ms. Zappia, and OMH Director of Human Resources ("HR") Rachel

Caplan-Combs. (Doc. 15-23 at 2.) In that letter she recounted calling Celeste Simmons on May 19, 2016 and requesting a "reasonable accommodation" of changing her place of employment to a state entity other than BPC. (*Id.*) She stated that Ms. Simmons replied by text on June 30, 2016 and said that the only position available was with OMH's Western New York Children's Psychiatric Center ("CPC"), and that that job was "temporary" because it would be a hire through an outside company. (*See id.*) Ms. Moxley further stated that her psychiatrist had provided her with a letter supporting her request for a change in her place of employment. (*Id.*) She faulted OMH for its "lack of response" and concluded that "[i]n order to enable me to return to work, I need to discuss the reasonable accommodation requested." (*Id.* at 3.)

## B. September 26, 2016 Formal Request for Accommodation

On August 9, 2016, Dr. Spacone forwarded Ms. Moxley's August 5, 2016 email to Vickie Eudell, stating that she was "[l]ooking for advice on how to proceed." (*Id.* at 2.) Ms. Eudell was OMH's Affirmative Action Administrator during the relevant time period. Her office was at the Hutchings Psychiatric Center in Albany, New York, but she also worked at other OMH facilities throughout the state. Her duties were to investigate complaints of discrimination, sexual harassment, and any protective category basis for discrimination; processing requests for reasonable accommodations; and participating in hiring and training.

Ms. Eudell emailed Ms. Moxley on August 10, 2016. (*Id.* at 4.) She wrote that she was "attaching the forms that you will need to complete in order for me to proceed and process your request for a reasonable accommodation." (*Id.*) Ms. Moxley completed an "Application to Request Reasonable Accommodation of a Disability" form on September 26, 2016. (*Id.* at 7–10.) She requested that her work location be moved to another state agency within approximately six miles of her home with the same "shift, pass days, and rate of pay that I am

currently receiving." (*Id.* at 7.) She included a "Healthcare Provider Form" signed by her physician on September 13, 2016 indicating a diagnosis of major depressive disorder and posttraumatic stress disorder ("PTSD") and opining that the reasonable accommodation to enable Ms. Moxley to perform the essential duties of the cleaner position would be placement in another facility. (*Id.* at 9–10.)

### C.   OMH's Response

Ms. Eudell testified that her "first offer" (Doc. 15-5 at 17) after receiving Ms. Moxley's September 26, 2016 request for a reasonable accommodation was for Ms. Moxley to work at CPC in Seneca, New York (*id.* at 10). Ms. Eudell testified that she mentioned that location in a conversation with Ms. Moxley and that Ms. Moxley did not want to work at CPC based on her understanding that it was closing or merging. (*See id.* at 12, 31.) Ms. Eudell testified that she accordingly "didn't pursue" placing Ms. Moxley at CPC any further. (*Id.* at 31; *see also id.* at 18.)

Ms. Eudell also testified that sometime after initially considering or suggesting CPC, she realized that CPC is separate from BPC and is its own appointing authority. (*See id.* at 10, 23.) According to Ms. Eudell, she told Ms. Moxley that she did not have authority to put her in another state agency. (*See id.* at 11.) She stated that she then contacted OMH counsel Alan Sunukjian to inquire about authority to place Ms. Moxley at CPC, and that he responded, "No. I don't even have the authority to do that." (*Id.*) Similarly, Ms. Zappia advised Ms. Eudell by email on October 28, 2016 that CPC "is separate from Buffalo PC and its own appointing authority[;] we do not say as to who they hire." (Doc. 15-24 at 2.)

Ms. Eudell testified that she also asked Ms. Moxley whether she would consider returning to work at BPC because Mr. McCray was suspended and no longer working there.

(Doc. 15-5 at 21.) Consistent with that testimony, the record shows that Ms. Eudell emailed Ms. Moxley on October 28, 2016 and asked: "[I]f Mr. McCray no longer worked at BPC; would you still be looking to work at another state agency?" (Doc. 15-24 at 4.) Ms. Moxley replied by email on November 1, 2016 stating: "This goes beyond Mr. McCray working at the facility." (*Id.*)[7] She asked whether Ms. Eudell could "guarantee that Mr. McCray will not be allowed to work at the Buffalo Psychiatric Center ever again." (Doc. 15-24 at 4.) Ms. Eudell replied that she could not make such a guarantee. (Doc. 15-5 at 21.)

Ms. Eudell further testified that after Ms. Moxley said that she did not want to work at CPC, Ms. Moxley stated that she wanted to work at SUNY Buffalo State College ("Buffalo State"). (*Id.* at 23.) According to Ms. Eudell, Ms. Moxley "was specific about what she wanted." (*Id.* at 24.) Ms. Eudell testified that she responded, "I definitely don't have that authority." (*Id.* at 12.) She testified that she never contacted anybody at Buffalo State because "[t]hat's out of my realm of responsibility." (*Id.* at 24.) Ms. Eudell testified that she told Ms. Moxley "several times" that she could not place Ms. Moxley at another state agency. (*Id.* at 15.)

According to Ms. Eudell, she also asked Ms. Moxley if she was on any eligible civil service lists. (*Id.* at 17.) Ms. Eudell testified that Ms. Moxley sent her the listing "but the list she was on were not positions in OMH." (*Id.*; *see also* Doc. 15-23 at 18 (printout of listing).) Ms. Eudell emailed Ms. Zappia on November 2, 2016 inquiring: "Is there another position outside of housekeeping (lateral) that we can offer Ms. Moxley as a reasonable

---

[7] Although Ms. Moxley did not elaborate in her email, it appears that at least part of Ms. Moxley's opposition to continuing to work at the facility related to the fact that Mr. McCray's nephews continued to work there. According to Ms. Eudell, Ms. Moxley did not mention that point during their discussions. (*See* Doc. 15-5 at 21.)

accommodation?" (Doc. 15-24 at 5.) Ms. Zappia replied: "We have to abide by Civil Service rules. They don't allow for transfers from a non-competitive title into a competitive title." (*Id.*)

Ms. Caplan-Combs wrote an email to Ms. Eudell on November 16, 2016 stating that she was looking into "what other job opportunities we could offer." (Doc. 15-24 at 10.) She noted that OMH was currently hiring provisional Mental Health Therapy Aid Trainees ("MHTATs"), but that the next MHTAT examination was not until February. (*Id.*) She also noted that OMH had approval to fill a motor vehicle operator position in the maintenance department, but that it required a CDL license. (*Id.*) She concluded that "[a]ll the other Maintenance positions we have approval to fill or for which we are seeking approval to fill require that Ms. Moxley be reachable on the eligible list or have specialized training and/or experience." (*Id.*)[8]

According to Ms. Eudell, Ms. Moxley advised that her (Ms. Moxley's) union—the Civil Service Employees Association ("CSEA")—said that OMH had authority to place Ms. Moxley at another OMH facility or other state agency. (*See* Doc. 15-5 at 15.) Ms. Eudell emailed Ms. Moxley on November 22, 2016 stating:

> I am reviewing your request in order to determine what, if any, reasonable accommodation your facility might be able to offer. However, as I have previously indicated to you, I have no jurisdiction to grant appointment at another OMH facility or at other New York State agencies. I am not sure which Article of the CSEA [OSU] contract you are referring [to] in your last email to me; however, if you identify it, I would be happy to review that as part of our interactive process.

(Doc. 15-25 at 7 (first brackets in original).)

---

[8] In an email dated December 6, 2016 and addressed to Ms. Eudell, Ms. Caplan-Combs noted that they had also discussed an "Office Assistant 1" position but that it would only be provisional. (Doc. 15-25 at 2.)

### D. Ms. Moxley Obtains Legal Counsel

Ms. Moxley replied to Ms. Eudell's November 22, 2016 email and stated that she had obtained an employment lawyer. She requested that Ms. Eudell direct all correspondence to her attorney. (Doc. 15-24 at 11.) Ms. Moxley's attorney, Harvey P. Sanders, wrote a letter to Dr. Spacone dated November 30, 2016. (Doc. 15-25 at 4.) Referring to Ms. Eudell's November 22, 2016 email, Attorney Sanders asserted that "Ms. Moxley is employed by the State of New York" and that if Ms. Eudell does not have the authority to grant Ms. Moxley appointment at another facility or agency, "someone else does." (*Id.*) He requested that Ms. Moxley be given "a reasonable accommodation and placed in another state facility so she can safely return to work." (*Id.*) In a letter dated January 18, 2017, Attorney Sanders stated that there were currently two state agency vacancies for which Ms. Moxley was qualified and to which she had applied: a cleaner at the Buffalo State, and a security officer at the Office for People with Developmental Disabilities. (*Id.* at 13.) He stated that Ms. Moxley should be transferred to one of those positions as a reasonable accommodation. (*Id.*)

## IX. October 2016 OMH Discrimination Complaints

Ms. Moxley completed two discrimination complaints in October 2016, one dated October 23, 2016 (Doc. 15-22) and a second one dated October 26, 2016 (Doc. 15-13). Date stamps on both documents indicate that both complaints were received at OMH's diversity office on October 27, 2016. (Docs. 15-13 at 1, 15-22 at 1.) Ms. Moxley claimed discrimination based on retaliation in the complaint dated October 23, 2016 (Doc. 15-22 at 2) and discrimination based on domestic-violence-victim status in the complaint dated October 26, 2016 (Doc. 15-13 at 2.)

Ms. Eudell investigated the allegations in Ms. Moxley's October 2016 complaints. (Doc. 15-5 at 26.) At her deposition, she could not recall which witnesses she interviewed in her investigation. (*Id.* at 27.) Ms. Eudell did recall her conclusion was that Ms. Moxley's complaints were unfounded. (*Id.*) Ms. Eudell concluded that Ms. Moxley's complaint that management did not properly or seriously address her safety concerns was unfounded. (*Id.* at 28.) She reasoned that "[b]ased on the E-mail strands that I found, management did take her Complaints seriously." (*Id.*) Regarding Ms. Moxley's claim that Mr. Jones harassed her by increasing her workload, Ms. Eudell concluded that the allegation was unfounded and the result of just a "one-day reassignment." (Doc. 15-5 at 27.) She reasoned: "When you're short a staff, you reassign people." (*Id.* at 27–28.) Regarding Ms. Moxley's claim that Mr. Jones advised Ms. DiMillo that Ms. Moxley never reported to work on May 12, 2016, Ms. Eudell concluded that the claim was unfounded because witnesses had stated that Ms. Moxley "wasn't there or when she came back." (*Id.* at 28.)

## X.    Mr. McCray Acquitted; Ms. Moxley Resigns; McCray Disciplined by Employer

Mr. McCray was tried and acquitted of the criminal charges in April 2017. According to the verified complaint, Mr. McCray's nephews were granted time off to attend his criminal trial. (Doc. 1 ¶ 32.) Ms. Moxley contrasts those grants of leave with her allegation that her own requests for leave to recover from her disability were denied due to a staff shortage. (*Id.*)

Ms. Moxley resigned from her employment with OMH on or about May 4, 2017. (Doc. 1 ¶ 45.) She applied to SUNY at Buffalo and was hired and began part-time employment there on or about May 4, 2017. (*Id.* ¶ 44.) The new position at SUNY involved a "substantial pay cut" for her. (*Id.*)

While on administrative leave, on June 14, 2016, Mr. McCray received a BPC Notice of Discipline arising out of the incident with Ms. Moxley. (Doc. 15-8.) He was suspended without pay and the penalty assessed against him was termination. He appealed the discipline and, pursuant to his union's collective bargaining agreement, the matter went to binding arbitration. The arbitrator issued his Opinion and Award on February 1, 2018. The arbitrator found Mr. McCray guilty of one of three aspects of the Notice of Discipline but found the proposed penalty of termination to be inappropriate. Instead, the arbitrator imposed a 180-day suspension without pay and directed that Mr. McCray be restored to his position at BPC. (Doc. 15-9.)

Ms. Moxley filed her verified complaint in this case on July 24, 2017. (Doc. 1.)

## Analysis

### I. Legal Standards

#### A. Summary Judgment in Discrimination Cases

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding whether there is a genuine dispute of material fact, the court "construe[s] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010). Initially the burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion has been made, the burden shifts to the nonmoving party to set out specific facts showing a genuine issue for trial. *Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996).

The Second Circuit has recognized "the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 74 (2d Cir. 2016) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)). Still, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." *Smith-Barrett v. Potter*, 541 F. Supp. 2d 535, 538 (W.D.N.Y. 2008) (alteration in original) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

**B.    Burden-Shifting Framework**

Ms. Moxley's disability discrimination, gender discrimination, and retaliation claims are all subject to the burden-shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Jackson v. N.Y.C. Dep't of Educ.*, 768 F. App'x 16, 18 (2d Cir. 2019) (summary order) (retaliation); *Abbott v. Wyoming Cty. Sheriff's Office*, No. 1:15-CV-00531 EAW, 2019 WL 4689045, at *7 (W.D.N.Y. Sept. 26, 2019) (disability discrimination); *King v. Aramark Servs., Inc.*, No. 1:19-cv-77, 2019 WL 3428833, at *17 (W.D.N.Y. July 30, 2019) (gender discrimination). Under the *McDonnell Douglas* test, "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse employment action]; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Jackson*, 768 F. App'x at 17 (alterations in original) (quoting *Cortes v. MTA N.Y.C. Transit*, 802 F.3d 226, 231 (2d Cir. 2015)).

## II.     Disability Discrimination: Failure-to-Accommodate Claim

Under the ADA and the Rehab Act, "the failure to make reasonable accommodations for one who is disabled can constitute discrimination." *Wernick v. Fed. Reserve Bank of N.Y.*, 91 F.3d 379, 384 (2d Cir. 1996).[9] "To establish a *prima facie* case of discrimination based on an employer's failure to accommodate a disability, under either the ADA or the Rehabilitation Act, a plaintiff must demonstrate that '(1) [the plaintiff] is a person with a disability under the meaning of [the statute in question]; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.'" *Natofsky v. City of New York*, 921 F.3d 337, 352 (2d Cir. 2019) (alterations in original) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009)). "A plaintiff alleging that [s]he was denied a reasonable accommodation bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [her] to meet the essential eligibility requirements of the service, program, or activity at issue." *McElwee v. Cty. of Orange*, 700 F.3d 635, 642 (2d Cir. 2012). "Once the plaintiff has demonstrated that there is a 'plausible accommodation, the costs of which, facially, do not clearly exceed its benefits,' the defendant bears the burden of proving that the requested accommodation is not reasonable." *Id.* (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)).

"Where the employee's disability is known to the employer, '[t]he ADA envisions an "interactive process" by which employers and employees work together to assess whether an

---

[9] The court's analysis here also applies to Ms. Moxley's failure-to-accommodate claim insofar as it is brought under the NYHRL. *See Timmel v. W. Valley Nuclear Servs. Co.*, No. 09-CV-5S, 2011 WL 5597350, at *4 (W.D.N.Y. Nov. 17, 2011) ("This Court will consider the ADA and NYHRL discrimination claims together, as they are analyzed under the same standard.").

employee's disability can be reasonably accommodated.'" *Stevens v. Rite Aid Corp.*, 851 F.3d 224, 231 (2d Cir. 2017) (quoting *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000)).

> An employer engages in an interactive process by, for example, "meeting with the employee who requests an accommodation, requesting information about the condition and what limitations the employee has, asking the employee what he or she specifically wants, showing some sign of having considered the employee's request, and offering and discussing available alternatives when the request is too burdensome."

*Sheng v. M&T Bank Corp.*, 848 F.3d 78, 87 n.3 (2d Cir. 2017) (quoting *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 218–19 (2d Cir. 2001)). "Whether or not something constitutes a reasonable accommodation is necessarily fact-specific" and "determinations on this issue must be made on a case-by-case basis." *Wernick*, 91 F.3d at 385.

"Liability for failure to provide a reasonable accommodation ensues only when the employer is responsible for a breakdown in [the interactive] process." *Bohen v. Potter*, No. 04-CV-1039S, 2009 WL 791356, at *13 (W.D.N.Y. Mar. 23, 2009) (alteration in original) (internal quotation marks omitted). "An employer impedes the process when: the employer knows of the employee's disability; the employee requests accommodations or assistance; the employer does not in good faith assist the employee in seeking accommodations; and the employee could have been reasonably accommodated but for the employer's lack of good faith." *Id.* (quoting *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1045 (8th Cir. 2005)). "An employee who is responsible for the breakdown of that interactive process may not recover for a failure to accommodate." *Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943, 946 (2d Cir. 2008) (summary order); *Winbush-Jones v. Potter*, No. 06-CV-6502 CJS, 2009 WL 497637, at *10 (W.D.N.Y. Feb. 26, 2009) (same; quoting *Nugent*).

Ms. Moxley claims that OMH discriminated against her on the basis of her disability in violation of the ADA and the Rehab Act by denying her a reasonable accommodation. (*See* Doc. 1 ¶¶ 49, 61.) Defendants argue that Ms. Moxley has failed to show that there was a vacant position that she could have performed and to which she could have been transferred under then-existing civil service rules. (Doc. 16 at 6–7.) Ms. Moxley argues that (1) her accommodation requests were not limited to finding a position outside of BPC; (2) there was at least one vacant position at another state agency into which she could have been transferred; and (3) Defendants failed to sufficiently engage in discussions with her about reasonable accommodations. (Doc. 18 at 3.)

### A. Alleged Failure to Reasonably Accommodate by Transfer

A "reasonable accommodation" may include "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). "[I]n order to recover under the ADA or the Rehabilitation Act for a failure to reasonably accommodate by transfer, a plaintiff bears the burden of establishing that a vacancy existed into which he or she might have been transferred." *Jackan*, 205 F.3d at 566 (2d Cir. 2000); *Amerose v. Monroe Cty. Water Auth.*, No. 10-CV-6383-CJS-MWP, 2012 WL 5398660, at *10 (W.D.N.Y. Nov. 2, 2012) (same; quoting *Jackan*). In the case of civil servants, the plaintiff must show that she could have been transferred to the vacant position "pursuant to then-existing civil service rules." *Molina v. City of Rochester*, 13-CV-6607, 2017 WL 1194493, at *9 (W.D.N.Y. Mar. 30, 2017) (quoting *Jackan*, 205 F.3d at 566).[10]

Defendants argue that Ms. Moxley has failed to carry her burden because the record shows that Ms. Eudell attempted to provide Ms. Moxley with the accommodation that she was

---

[10] The court perceives this rule concerning civil servants to be related to the more general proposition that the ADA and the Rehab Act are not intended to "interfere with personnel decisions within an organizational hierarchy." *Wernick*, 91 F.3d at 384.

seeking, but learned that Ms. Moxley did not want to go to CPC, and also learned that she lacked

authority to place Ms. Moxley into a position at another state agency. Ms. Moxley maintains

that she has presented evidence of numerous vacant positions at state agencies other than OMH

into which she could have been transferred, including a cleaner position at Buffalo State. In

Ms. Moxley's view, even if Ms. Eudell did not have authority to place her with another state

agency, the record shows that Defendants failed to engage in meaningful discussions with her.

Defendants insist that Ms. Moxley could not have been transferred to another state agency

because only "competitive" class employees can be transferred under New York's Civil Service

Law and rules. And, according to Defendants, Ms. Moxley's insistence on a transfer that was

categorically unavailable to her was what led to a breakdown in the interactive process, thereby

precluding recovery on her claim.

The court begins with the question of whether transfer is limited to competitive class

employees. Ms. Moxley argues that then-existing civil service rules "clearly outline a procedure

for the transfer of employees such as Plaintiff." (Doc. 18 at 4.) In support, she cites

4 N.Y.C.R.R. §§ 1.2 and 5.1. Section 1.2 defines "transfer" as:

> the change, without further examination, of a permanent employee from a position
> under the jurisdiction of one appointing authority to a position under the jurisdiction
> of another appointing authority or to a position in a different title in the same or a
> higher salary grade under the jurisdiction of the same appointing authority.

*Id.* § 1.2(b)(1). Defendants assert that the cited rules apply only to transfers of competitive-class

employees. (Doc. 25 at 4.) Defendants maintain that the civil service law and rules do not allow

for transfer of employees in the "labor" classification from one state agency to another. (Doc. 25

at 2; *see id.* at 4 (asserting that "there is no provision in the Civil Service Law or Rules for

voluntary transfers for other than 'competitive' class employees").)

The transfer rules that Ms. Moxley cites are "[i]n addition to the conditions and limitations pre scribed by statute." 4 N.Y.C.R.R. § 5.1(a). It is therefore necessary to examine the statutory limitations on transfers. The civil service in New York is divided into classified and unclassified service. N.Y. Civ. Serv. Law § 35. The classified service is divided into four classes: "the exempt class, the non-competitive class, the labor class, and the competitive class." Id. § 40. The labor class comprises "all unskilled laborers in the service of the state and each of its civil divisions except those whose positions can be examined for competitively." Id. § 43. The competitive class includes "all positions for which it is practicable to determine the merit and fitness of applicants by competitive examination" and includes all classified positions "except such positions as are in the exempt class, the non-competitive class or the labor class." Id. § 44. It appears to be undisputed that Ms. Moxley's position as a cleaner for OMH was not within the competitive class.[11]

The statutory provisions on transfers appear at N.Y. Civ. Serv. Law § 70.[12] Most of the provisions of that section are plainly inapplicable to Ms. Moxley's request for a transfer. Her function was not being transferred, so N.Y. Civ. Serv. Law § 70(2) was not implicated. Section 70(4) is explicitly limited to "any permanent employee in the competitive class." Id. § 70(4).[13] Section 70(5) relates only to police departments. Section 70(6) concerns transfers between city agencies. And § 70(7) is limited to transfer of Suffolk county park officers.

_____

[11] Indeed, the Department of Civil service lists "cleaner" as within the labor class. See Dep't of Civil Serv., Positions Classified in the Labor Class, available at http://www.cs.ny.gov/cc/docs/com/Laborclass.doc (last visited Oct. 29, 2019).

[12] There is also a provision in § 52 for transfers between "administrative positions," but since "administrative positions" are "competitive class positions," that provision does not apply in Ms. Moxley's case. See N.Y. Civ. Serv. Law § 52(6)(a).

[13] There is no subdivision (3) in § 70.

That leaves the "general provisions" subdivision; it states in pertinent part that "no employee shall be transferred to a position for which there is required by this chapter or the rules established hereunder an examination involving essential tests or qualifications different from or higher than those required for the position held by such employee." *Id.* § 70(1). Defendants argue that the use of the word "examination" in this provision implies that labor classification positions do not qualify for transfers because examinations are not required for labor class positions. (Doc. 25 at 3.)

Defendants have not cited any cases expressly holding that transfers are available only to competitive-class employees. The court's research has revealed relatively few cases on this point. However, in *Civil Service Employees Association, Inc., Westchester Chapter, Local 860 v. Town of Harrison*, the court referred to the provisions of § 70 as concerning "transfers in competitive class positions." No. 07488/76, 1977 WL 25053 (N.Y. Sup. Ct. June 6, 1977). In addition, recent New York state publications are in accord with that interpretation. *See* N.Y. Dep't of Civil Service, *Information for Employees Seeking Transfer*, https://www.cs.ny.gov/jobseeker/faq/transfer.cfm (last visited Oct. 29, 2019) ("A transfer is the movement of a permanent *competitive class* employee from a position in one title to a position in a different title, or from a position in one agency to a position in another agency. *Both positions must be within the competitive class*." (emphasis added)).[14] These authorities strongly suggest that transfer was not an available accommodation for Ms. Moxley.

---

[14] Defendants have included a copy of this document at Doc. 24-2. The same language appears in a publicly available information packet from the New York Career Mobility Office. *See* N.Y. Career Mobility Office, *Information Packet* at 6, https://careermobilityoffice.cs.ny.gov/cmo/documents/CMO%20Information%20Packet.pdf (last visited Oct. 29, 2019). Similarly, the New York's own Department of Labor Employee Handbook states that "[t]ransfers apply only to employees who have permanent competitive

Even assuming that transfer to another state agency was technically possible for Ms. Moxley, there is no evidence that anyone within OMH had the authority to grant the transfer. It does not appear that OMH is an appointing authority for any agency other than itself. *See* N.Y. Civ. Serv. Law § 2 ("The term 'appointing authority' or 'appointing officer' means the officer, commission or body having the power of appointment to subordinate positions."). Thus Ms. Moxley has failed to show that Ms. Eudell or anyone within OMH had authority to compel another state agency to accept Ms. Moxley's employment.

### B.    Alleged Failure to Sufficiently Engage in Interactive Process

Ms. Moxley argues that, even so, "Ms. Eudell and Defendants still failed to engage in the interactive process required for reasonable accommodation discussions." (Doc. 18 at 5.) She maintains that "[r]egardless of whether Ms. Eudell had such authority, the record establishes she and everyone else at BPC involved in Plaintiff's request for a new position failed to make any meaningful effort toward finding Plaintiff a position with another state agency." (*Id.* at 6.) Defendants assert that they appropriately participated in the interactive process but that the process broke down because Ms. Moxley insisted on being transferred to another state agency within the Western New York area with her same pay grade and days off. (*See* Doc. 25 at 5.)

The court considers in turn the aspects of OMH's conduct that Ms. Moxley challenges. First, Ms. Moxley claims that OMH's response to her May and August 2016 requests were inadequate. She faults Ms. Simmons for taking several weeks to reply to her May 19, 2016 email and for then offering only a temporary position at CPC that was not a state position. She also faults Dr. Spacone for not immediately responding to her August 5, 2016 email and instead

---

status." N.Y. Dep't of Labor, *Employee Handbook* at 26, https://www.labor.ny.gov/formsdocs/personnel/ga9.pdf (last visited Oct. 29, 2019).

forwarding it to Ms. Eudell. (*See* Doc. 18 at 6.)  But those events occurred prior to

Ms. Moxley's September 26, 2016 formal request for a reasonable accommodation.  Since OMH

proceeded to engage in an interactive process after that formal request, these early events do not

prove that OMH acted in bad faith or was responsible for the breakdown in the process.

Second, Ms. Moxley faults Ms. Eudell for failing to contact other state agencies to

inquire whether they could accept Ms. Moxley's employment. (*Id.* at 6–7.)  She suggests that if

Ms. Eudell was not the proper authority for reaching out to other agencies, then she or someone

at OMH should have identified the person with that responsibility.  She cites Ms. DiMillo's

testimony that Ms. DiMillo was not sure who within OMH would be responsible for reaching out

to another state agency to see if that agency would be interested in taking another employee.

(Doc. 19-14 at 6.)  According to Ms. DiMillo, that "sounds like an HR role, if any." (*Id.*)  She

testified that Ms. Eudell is in a separate chain of authority than the BPC HR function. (*Id.*)

Ms. DiMillo stated that, if BPC's HR department had the ability to ask other agencies if they

would take a BPC employee as a reasonable accommodation, "the director of HR would

potentially assign that to someone." (*Id.*)  But she stated, "it's my understanding we're not able

to do that." (*Id.*)

Defendants respond that, even if Ms. Eudell or someone from the HR department did

identify an open position at another agency and contact that agency, they still had "no means by

which to place Plaintiff in those positions." (Doc. 25 at 5.)  The court agrees.  Ms. Moxley cites

no civil service rule or practice under which OMH could effect a transfer to another state agency.

Instead, Ms. Moxley essentially faults Defendants for failing to contact other state agencies to

encourage them to hire her as a transfer or otherwise help her get a job at another agency.

(*See* Doc. 18 at 7.)  But assuming that another agency could hire Ms. Moxley as a transfer, OMH

was not required to "interfere with personnel decisions" within New York's organizational hierarchy. *Wernick*, 91 F.3d at 384. And OMH was not required to do anything more than to give Ms. Moxley the "same opportunities" as those available to nondisabled persons. *Id.* Ms. Moxley's disability did not prevent her from working at any facility other than BPC, so she already had the same opportunities as other persons to identify and apply for work at other agencies.

### C. Alleged Failure to Accommodate Safety Concerns

Re-asserting a claim from her October 2016 OMH discrimination complaint, Ms. Moxley also claims that OMH "ignored" her "first accommodation request"—i.e., her request to address her safety concerns at BPC. (Doc. 18 at 9.) Defendants argue that Ms. Moxley did not present this request as one for an accommodation of any disability. (Doc. 25 at 6.) The court agrees that Plaintiff has failed to state a prima facie ADA or Rehab Act claim arising out of this alleged failure because there is no evidence that OMH had notice that Ms. Moxley had a disability at the time that she expressed her concerns about her safety in April 2016. *See Natofsky*, 921 F.3d at 352 (essential element of prima facie case is employer's notice of employee's disability).

OMH indisputably had notice from Ms. Moxley's April 13, 2016 email of Ms. Moxley's recollection of the April 5 incident and that she was uncomfortable and fearful. But OMH had no notice that Ms. Moxley had a disability at the time of her mid-April 2016 communications with BPC leaders about her safety concerns. Notice of Ms. Moxley's description of the April 5 incident did not simultaneously constitute notice of a disability. *Cf. Pineda v. ESPN, Inc.*, No. 3:18-cv-325 (MPS), 2018 WL 5268123, at *3 (D. Conn. Oct. 23, 2018) (acknowledging that "rape-related PTSD" is a mental impairment but finding insufficient allegations that it

substantially limited plaintiff's major life activities such that it qualified as a "disability" as defined by the ADA or Rehab Act).

Even assuming that OMH was on notice that Ms. Moxley had a disability prior to Ms. Moxley's May 19, 2016 request for a reasonable accommodation by transfer, Ms. Moxley has failed to present sufficient evidence that OMH refused to make reasonable accommodations regarding Ms. Moxley's safety at BPC. *See Natofsky*, 921 F.3d at 352 (essential element of prima facie case is employer's refusal to make reasonable accommodations). The evidence shows that Ms. DiMillo and Dr. Spacone promptly responded to Ms. Moxley's concerns, proposed solutions, and invited Ms. Moxley to communicate any further safety concerns. Ms. Moxley argues that the response to her safety concern was inadequate, but even giving her the benefit of all reasonable inferences, the court concludes that the response—even if not perfect—was reasonable.

Ms. Moxley challenges Ms. DiMillo's suggestion that, if Mr. McCray returned to work at BPC, he could be assigned to the Strozzi building while Ms. Moxley worked at the Butler building. According to Ms. Moxley, that solution would have been at odds with the TOP, which required Mr. McCray to stay away from Ms. Moxley's "place of employment." But assuming that Ms. DiMillo's idea was incompatible with the TOP as it then stood, the issue was moot because Mr. McCray did not return to work at BPC until well after Ms. Moxley left.

Ms. Moxley also asserts that BPC's response to her safety concerns failed to adhere to the requirements in BPC's own "Domestic Violence and the Workplace" policy (Doc. 19-1). She claims that under the policy Ms. Caplan-Combs was the designated Domestic Violence Liaison, yet Ms. Caplan-Combs never met with her regarding her safety concerns. Ms. Moxley also faults Ms. DiMillo for failing to develop an individualized workplace safety plan or emergency

response plan. (*See* Doc. 18 at 9–10.) In addition, Ms. Moxley contrasts Ms. DiMillo's instruction to contact a safety officer if she felt unsafe with the fact that there was no safety department post at the Butler building. She also faults Ms. DiMillo for failing to advise her that she had instructed Mr. Brown and Mr. Williams to stay away from her. (*Id.* at 10.) None of these failings rises to the level of failure to reasonably accommodate Ms. Moxley's safety concerns.

## III. Gender Discrimination

Defendants interpret Ms. Moxley's gender-discrimination claim as a claim that she was subjected to a hostile work environment between the April 5, 2016 incident and her last day working at BPC on May 12, 2016. Defendants claim that this claim fails "because the conduct she alleges created a hostile environment was neither sufficiently severe or pervasive to alter the conditions of her work environment, nor is there evidence imputing the conduct to Defendants." (Doc. 16 at 11.) Ms. Moxley maintains that "the record establishes Plaintiff suffered gender-based harassment, a hostile work environment, and retaliation." (Doc. 18 at 16.) She further contends that the alleged conduct can be imputed to Defendants because "Mr. Jones's and Ms. DiMillo's authority as Plaintiff's supervisors make Defendants vicariously liable, and because Defendants never took any action to address Plaintiff's concerns about Mr. Jones, Mr. Brown, and Mr. Williams, even after she complained." (*Id.* at 22.)

### A. Hostile Work Environment

"[A] Title VII plaintiff complaining of a hostile work environment must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Bentley v. AutoZoners, LLC*, 935 F.3d 76, 90 (2d Cir. 2019) (internal

quotation marks omitted).[15] "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Bentley*, 935 F.3d at 90 (quoting *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014)). "The incidents complained of must be more than episodic; they must be sufficiently continuous and concerted . . . ." *Id.* (quoting *Raspardo*, 770 F.3d at 114). "A plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 241 (2d Cir. 2007) (quoting *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999)).

"[T]o hold an employer liable for such a hostile work environment, federal law requires the plaintiff to show 'a specific basis for imputing the conduct creating the hostile work environment to the employer.'" *Bentley*, 935 F.3d at 90 (quoting *Summa v. Hofstra Univ.*, 708 F.3d 115, 124 (2d Cir. 2013)). "Two such bases exist: strict vicarious liability if an employer's supervisor has created the hostile environment, and negligence if a co-worker who is not a supervisor has created the hostile environment, and the employer, upon becoming aware of the misconduct, fails to remedy it." *Id.* at 91 (citations omitted).

Courts review the "totality of the circumstances" to determine whether a plaintiff has met the burden of showing an objectively hostile or abusive work environment. *Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 74 (2d Cir. 2019). The court considers "the frequency of the

---

[15] Insofar as it is brought under the NYHRL as well as Title VII, Ms. Moxley's gender-based hostile-work-environment claim is analyzed using the same standard for both. *See Abbott*, 2019 WL 4689045, at *12 ("[C]ourts generally 'analyze hostile work environment claims under the ADA and the NYHRL using the same standard that they apply to Title VII hostile work environment claims.'" (quoting *Guinup v. Petr-All Petroleum Corp.*, 786 F. Supp. 2d 501, 515 (N.D.N.Y. 2011))).

discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unnecessarily interfere[d] with [the plaintiff's] work performance." *Id.* (alterations in original) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "Even an isolated act may be so serious that it requires the conclusion that the terms and conditions of employment were altered." *Id.* Thus a plaintiff could demonstrate "either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently concerted to have altered the conditions of her working environment." *Id.* (quoting *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)).

According to Defendants, the conduct upon which Ms. Moxley relies for her claim consists of the following:

> 1) Spacone and DiMillo allegedly not taking her safety concerns seriously; 2) her supervisor Jones substituting cleaners to assist her in cleaning the Butler Building; 3) Jones ignoring phone calls and pages; 4) Jones telling a superior that she was not at work one day; and, 5) McCray's nephews, co-workers Brown and Williams, giving her dirty looks.

(Doc. 16 at 11.) Ms. Moxley challenges that list as inaccurate and incomplete. The court considers the conduct in turn, keeping in mind that it must consider the totality of the circumstances and must consider the evidence in the light most favorable to Ms. Moxley.

### 1.    Response to Safety Concerns

Defendants assert that Dr. Spacone and Ms. DiMillo did take Ms. Moxley's safety concerns seriously. Ms. Moxley maintains that the record establishes that they did not, and that there is at least a dispute of fact on this point. For the reasons stated above, the court concludes that, even in the light most favorable to Ms. Moxley, the evidence shows that the response to Ms. Moxley's safety concerns—even if not perfect—was reasonable. Nothing about Dr. Spacone and Ms. DiMillo's response constitutes hostility or abuse.

### 2. Increased Workload

Ms. Moxley disputes Defendants' suggestion that Mr. Jones "substituted" cleaners to assist her in cleaning the Butler Building. Indeed, the evidence in the light most favorable to Ms. Moxley is that after the April 5 incident Mr. Jones reassigned Mr. Wright away from the Butler building and assigned Mr. Boquard there but for less time than Mr. Wright had been present. To the extent that Mr. Jones "substituted" Mr. Boquard for Mr. Wright, the evidence in the light most favorable to Ms. Moxley is that Mr. Boquard was assigned to assist Ms. Moxley less frequently than Mr. Wright had been, thereby resulting in increased work for Ms. Moxley.

But the increase in workload does not contribute significantly to any alleged objectively hostile or abusive work environment. Ms. Moxley's testimony does not establish how many times she was required to clean the Butler building alone; at best it appears to be some episodic instances. Ms. Moxley does not contend that the alleged increased work was physically threatening or humiliating.

### 3. Alleged Refusal to Respond to Calls and Pages

No evidence establishes the precise frequency of Mr. Jones's alleged refusal to respond to Ms. Moxley's work-related calls and pages. Ms. Moxley testified that she did not have an estimate of the number of instances of this alleged conduct. The severity of these failures is difficult to evaluate in the abstract. The sole incident that Ms. Moxley describes in detail involves Mr. Jones's response to her inquiry about the incident with the ground cinnamon. Even in the light most favorable to Ms. Moxley, that incident was not so severe that it altered the terms or conditions of employment.

### 4. Mr. Jones's Statement Regarding Ms. Moxley's Absence from Work

Defendants assert that the evidence does not support the contention in the complaint that Mr. Jones told Ms. DiMillo that Ms. Moxley "never reported to work" on May 12, 2016. (Doc. 1 ¶ 29.) The court has taken care to recite the evidence related to this issue above. Even in the light most favorable to Ms. Moxley, this event does not contribute significantly to any alleged objectively hostile or abusive work environment. It was an isolated incident where Ms. Moxley's superior contacted his superior after developing a reasonable basis to believe she failed to promptly return from the morning break. While it was undoubtedly unpleasant to learn that her superiors investigated this issue, Mr. Jones's conduct in this regard was not physically threatening or humiliating in any material respect.

### 5. "Threatening Looks" from Mr. McCray's Nephews

Ms. Moxley has presented evidence that after the April 5 incident, Mr. McCray's nephews Mr. Brown and Mr. Williams made her feel uncomfortable and fearful by looking at her in a "very threatening" way. (Doc. 15-1 at 50.) She could not recall the dates or number of instances of threatening looks.

Frequent hostile stares can constitute evidence supporting a finding of an abusive working environment. *See Bowen v. Mo. Dep't of Soc. Servs.*, 311 F.3d 878, 885 (8th Cir. 2002) (reasonable jurors could find pervasively hostile work environment where there was evidence of offensive epithets, menacing remarks, frequent hostile stares, destroying a cake, threats of physical violence, and running directly at the plaintiff). But this case is unlike *Bowen*. There was evidence in that case that the hostile stares occurred on a "near daily basis," *id.* at 881, whereas Ms. Moxley could not recall the number of instances of threatening looks directed against her. Critically, there is no evidence of any accompanying epithets, verbal threats, or

violent conduct as in *Bowen*. Nor is there any significant evidence that the threatening looks interfered with Ms. Moxley's work performance.

Considering all of the alleged conduct together, the court concludes that Plaintiff has failed to meet her burden of showing an objectively hostile or abusive work environment. The conduct discussed above, individually and taken together, does not rise to that level. In light of that conclusion, the court does not reach Defendants' alternative argument that there is insufficient evidence imputing the alleged discriminatory conduct to Defendants.

**B.      Denial of Leave Request**

In addition to her hostile work environment claim, Ms. Moxley asserts that she suffered discrimination based on her sex "when BPC denied her the use of vacation time to treat her disability while BPC consistently granted male employees time off." (Doc. 18 at 17.) She notes that Defendants failed to address that claim in their motion for summary judgment. Defendants do not mention it in their reply memorandum, either.

Under the *McDonnell Douglas* framework, Ms. Moxley must make out a prima facie case of gender discrimination by showing that "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Walsh*, 828 F.3d at 75 (internal quotation marks omitted). Plaintiff has failed to meet her burden as to the third element. The evidence is that Ms. DiMillo denied a single vacation request. Such a denial, "without any indication that there was an absolute prohibition against plaintiff taking any vacation time, is not a material adverse employment action." *Chukwuka v. City of New York*, 795 F. Supp. 2d 256, 261 (S.D.N.Y. 2011) (quoting *Roff v. Low Surgical & Med. Supply, Inc.*, No. CV-03-3655(SJF)(JMA), 2004 WL 5544995, at *4 (E.D.N.Y. May 11, 2004)).

## IV.    Retaliation

Under either the Rehab Act or the ADA, Ms. Moxley must establish a prima facie case of retaliation by showing that "(i) [she] was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Natofsky*, 921 F.3d at 353 (alterations in original) (quoting *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002)).[16] If the plaintiff establishes her prima facie case, the defendants must respond by providing a "legitimate, non-retaliatory reason for the adverse employment action." *Canady v. Univ. of Rochester*, 736 F. App'x 259, 262 (2d Cir. 2018) (summary order) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)). "A plaintiff must then show that the employer's retaliatory motive was a but-for cause of the adverse action 'by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action.'" *Id.* (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).

Defendants argue that Ms. Moxley cannot prove a prima facie case of retaliation because, they contend, "she did not engage in a protected activity separate and apart from requesting reasonable accommodation." (Doc. 16 at 8.) They also assert that Ms. Moxley cannot prove that but for engaging in the alleged protected activity she would have been granted the accommodation she was asking for. (*Id.* at 9.) Ms. Moxley maintains that she can prove her

---

[16] The court's analysis here also applies to Ms. Moxley's retaliation claim insofar as it is brought under the NYHRL. *See Abbott*, 2019 WL 4689045, at *12 ("[R]etaliation claims under the NYHRL are generally 'governed in this respect by the same standards as the ADA.'" (quoting *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002))).

retaliation claim on the basis of alleged adverse action for requesting a reasonable accommodation. (*See* Doc. 18 at 11.) She also argues that the complaint includes allegations of other retaliatory actions, including Mr. Jones's alleged conduct, alleged discriminatory conduct with respect to leave requests, and alleged failure to accommodate her safety concerns. (*Id.* at 12–15.) She contends that these other retaliatory actions were not justified by any legitimate, non-discriminatory reason. (*Id.* at 15.)

### A.  No Retaliation Claim for Denial of Request for Accommodation by Transfer

Defendants cite *Snowden v. Trustees of Columbia University* for the proposition that "any activity comprising Plaintiff's primary failure-to-accommodate claim, such as the submission of a reasonable accommodation request form or participating in the post-request interactive process, cannot also constitute protected activity such as that required to form the basis of a retaliation claim." No. 12 Civ. 3095(GBD), 2014 WL 1274514, at *6 (S.D.N.Y. Mar. 26, 2014) (citing *Missick v. City of New York*, 707 F. Supp. 2d 336, 356–57 (E.D.N.Y. 2010)). Citing *Snowden*, the district court in *Daley v. Cablevision Systems Corporation* concluded that "Plaintiff's ADA retaliation claim cannot be premised upon his request for an accommodation or participation in the [job search accommodation] process." No. 12-cv-6316 (NSR), 2016 WL 880203, at *7 (S.D.N.Y. Mar. 7, 2016).

On appeal, the Second Circuit described that conclusion as "[t]he only potential error in the district court's thorough opinion." *Daley v. Cablevision Sys. Corp.*, 675 F. App'x 97, 98 (2d Cir. 2017) (summary order). The Second Circuit remarked that "[i]t is not entirely clear whether that conclusion is correct under our case law." *Id.* (citing *Weixel*, 287 F.3d at 149). The Second Circuit did not decide that issue because it found that the district court properly granted summary judgment to the employer because the employer proffered legitimate, non-

discriminatory reasons for the adverse employment action and the plaintiff failed to present evidence of pretext. *Id.* Relying on the Second Circuit's decision in *Daley*, Ms. Moxley maintains "even if the only protected activity Plaintiff engaged in was her request for accommodation, and even if Plaintiff was not ultimately entitled to such an accommodation, her retaliation claim would still have merit." (Doc. 18 at 11.)

This court concurs with the analysis in *Adams v. Delta Airlines, Inc.*: "The weight of authority indicates that a request for an accommodation can form the 'protected activity' basis for a retaliation claim." No. 16-CV-1986(KAM) (LB), 2018 WL 1532434, at *5 n.8 (E.D.N.Y. Mar. 29, 2018) (citing *Weixel*, 287 F.3d at 148–49). "Additionally, the language from *Snowden*, that the district court cited in *Daley*, in turn cited *Missick*, which stands only for the proposition that denial of a request for an accommodation cannot constitute an adverse employment action." *Id.* The court accordingly concludes that Ms. Moxley's request for accommodation could constitute a "protected activity" for purposes of the first element of her prima facie case. At the same time, the court concludes that her retaliation claim fails insofar as it is premised on the denial of her request for transfer as an accommodation. The court considers other alleged retaliatory conduct next.

## B.    Other Alleged Retaliatory Conduct

Defendant's motion for summary judgment does not explicitly address any allegedly retaliatory conduct other than denial of Ms. Moxley request for accommodation by transfer. (*See* Doc. 16 at 8–9.) In her opposition, Ms. Moxley contends that she has presented evidence of adverse employment action separate and apart from denial of her request for accommodation by transfer. She asserts that Mr. Jones and Mr. McCray's nephews Mr. Brown and Mr. Williams engaged in a "pattern of harassment" against her after she raised her concerns about her safety.

(Doc. 18 at 12.) She also asserts that Defendants retaliated against her by denying her request to use vacation time to take time off to treat her disability. (*Id.*) Defendants' reply memorandum does not respond to those arguments.

The alleged harassment by Mr. McCray's nephews and the denial of the vacation request both occurred after Ms. Moxley raised concerns about her safety in April 2016 but before her May 2016 and subsequent requests for a reasonable accommodation. The court accordingly considers whether Ms. Moxley's communications with BPC leaders in mid-April 2016 could be considered "protected activity."

> An employee's complaint may qualify as protected activity . . . so long as the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law. *And not just any law—the plaintiff is required to have had a good faith, reasonable belief that she was opposing an employment practice made unlawful by Title VII* [or the ADA]. The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances. A plaintiff's belief on this point is not reasonable simply because he or she complains of something that appears to be discrimination in some form.

*Dapson v. City of Rochester, New York*, No. 17-CV-6704 CJS, 2019 WL 591692, at *14 (W.D.N.Y. Feb. 12, 2019) (quoting *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 14–15 (2d Cir. 2013)). The court finds this element lacking on the present record.

Here, as noted above, there is insufficient evidence to conclude that Ms. Moxley's communications with BPC leaders in mid-April 2016 constituted an "accommodation" request under the ADA or a challenge to an employment practice made unlawful by Title VII. There is no evidence that Defendants were on notice at the time that Ms. Moxley was requesting security precautions due to a disability. Ms. Moxley has not advanced any other cogent theory as to how her mid-April 2016 communications with BPC leaders might constitute "protected activity."

## **Conclusion**

Defendants' Motion for Summary Judgment (Doc. 14) is GRANTED.

Dated this __4__ day of November, 2019.

Geoffrey W. Crawford, Judge
United States District Court